## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

ONE BANK & TRUST, N.A.                                                   **PLAINTIFF**

v.                                            **No. 4:11-cv-00567 KGB**

CARMELO GALEA a/k/a CHARLES GALEA,
FAE A. GALEA, and ANTHONY W. IMBIMBO,
as Trustee of THE CARMELO GALEA FAMILY
INSURANCE TRUST                                                  **DEFENDANTS**

### OPINION AND ORDER

Plaintiff, One Bank & Trust, N.A. ("One Bank"), seeks judgment against defendant The

Carmelo Galea Family Insurance Trust (the "Trust") on a promissory note and against

defendants Carmelo Galea a/k/a Charles Galea and Fae A. Galea (the "Galeas") as guarantors of

the note.  One Bank filed its complaint in the Circuit Court of Pulaski County, Arkansas, on June

8, 2011.  Defendants removed the action to this Court and filed a counterclaim alleging fraud,

negligence, and mutual mistake.  One Bank has moved for summary judgment on the note and

guaranties and on defendants' claims of fraud and mutual mistake (Dkt. No. 47).[1]  For the

reasons that follow, One Bank's motion is granted in part and denied in part.

### I.     Background

Mr. Galea is a businessman, and the company he is the principal stockholder and

controlling owner of has had revenues recently from $4 million to $6 million (Dkt. No. 49, ¶ 2;

Dkt. No. 58, Exhibit C, at 10:16-25).  In his business, Mr. Galea deals with contracts in the form

of purchase orders up to $250,000.00 (Dkt. No. 58, Exhibit C, at 9:12-10:10).

In 2008, Anthony Imbimbo, a representative of the Galeas, spoke with Andrew Castro of

Lincoln Financial Group ("Lincoln Financial") about purchasing life insurance on the life of Mr.

---

[1] The Court previously dismissed defendants' negligence claim for failure to state a claim
upon which relief may be granted.

Galea.   Mr. Imbimbo is a certified public accountant, licensed to practice in the State of California (Dkt. No. 49, ¶ 3).  Mr. Castro represented to Mr. Imbimbo that a non-recourse loan would be obtained to pay the first year's policy premium (Dkt. No. 58, Exhibit A, at 24:24-25:3; 26:1-6).  Mr. Castro did not indicate who the lender would be (Dkt. No. 58, Exhibit A, at 25:23-26:6).   With that information, Mr. Imbimbo, as trustee of the Trust, purchased three life insurance policies from Lincoln Financial.

Mr. Castro asked Christopher Hammatt, a California attorney, to find a lender for the Galeas (Dkt. No. 56, Exhibit A, at 15:16-16:16).  Mr. Hammatt, in turn, contacted Steve Burgess of the Burgess Group (the "Burgess Parties") (Dkt. No. 56, Exhibit A, at 18:1-25).  Mr. Hammatt testified in his deposition that the Burgess Parties, before securing financing through a specific bank, represented to him that the financing would be non-recourse (Dkt. No. 56, Exhibit A, at 30:11-19; 38:12-20).  The Burgess Parties eventually arranged financing through One Bank.

On July 11, 2008, Heather Redding of the Burgess Group sent an email to Mr. Hammatt containing a list of documents that were needed to process the loan which states that "we can get credit committee approval and loan documents out to you Tuesday morning" (Dkt. No. 56-9).  In an email dated July 15, 2008, Nick Guerriero, Mr. Castro's assistant, asked Ms. Redding if they would be receiving the loan documents that day (Dkt. No. 56-8).  Ms. Redding responded that the bank still needed copies of some tax returns before it could approve the loan and confirmed that "we are funding . . . the first year premiums . . . ." (Dkt. No. 56-8).  Ms. Redding emailed the loan documents to Mr. Hammatt and Mr. Guerriero the next day and stated that "we fund with a copy of the executed documents" (Dkt. No. 56-5).  Mr. Imbimbo obtained the loan documents from Mr. Castro's office and passed them along to Mr. Galea (Dkt. No. 58, Exhibit A, at 31:1-12).

On July 17, 2008, Mr. Guerriero emailed Ms. Redding to inform her that Mr. Hammatt was "in the office" and had "all the original executed docs . . . ." (Dkt. No. 56-6).  Later that afternoon, Mr. Hammatt emailed Ms. Redding to inform her that he had the original loan documents and that he would make arrangements with Mr. Burgess to "get him the rest of the items" (Dkt. No. 56-6).

The loan documents were executed on or about July 16, 2008 and returned by Mr. Imbimbo to Mr. Castro's office (Dkt. No. 58, Exhibit A, at 33:7-9).  The loan documents included two personal guaranties, one for each of the Galeas.  One Bank contends the Galeas executed these guaranties.  Mr. Galea does not dispute the genuineness of his signature but disclaims knowing the document was a guaranty and disputes its enforceability.  Ms. Galea disputes the genuineness of her signature, disclaims knowing the document was a guaranty, and disputes its enforceability.

Defendants never communicated directly with One Bank or the Burgess Parties during the loan transaction, prior to the loan documents being signed (Dkt. No. 49 ¶ 15; Dkt. No. 57 ¶ 15).  Mr. Imbimbo did not communicate with anyone outside of Mr. Castro's office, and Mr. Galea communicated through Mr. Imbimbo (Dkt. No. 58, Exhibit A, at 28:24-29:4; Exhibit C, at 23:22-24:2).  Mr. Castro never told Mr. Imbimbo that the Burgess Parties would arrange the financing (Dkt. No. 58, Exhibit A, at 25:23-26:6).  At the time of the loan, Mr. Galea did not believe Mr. Burgess had any relationship with One Bank (Dkt. No. 58, Exhibit C, at 32:13-18).

In fact, defendants did not know of the Burgess Parties' involvement until they were informed in October 2009 that the insurance policies had lapsed due to nonpayment of premiums (Dkt. No. 58, Exhibit A, at 24:12-13; 28:1-10; Exhibit C, at 22:15-24).  It was at this time, Mr. Galea maintains, that he learned he may have signed a personal guaranty.

Around the same time and in the months leading up to October 2009, the Burgess Parties exchanged several emails regarding the loan transaction. On June 26, 2009, Megan Rytting of the Burgess Group sent the following email to Vernon Scott, a One Bank loan officer: "Steve mentioned that you should have a file and notes on the transaction mentioning it as a yearly renewable term type loan that would require the normal One Banc up-dates but that there would be an option to renew. He also thought that this was laid out in the loan documents." (Dkt. No. 36-4). Ms. Rytting followed up with an email on July 6, 2009: "So there aren't any notes or anything about a scheduled renewal on this one right? I am trying to reconcile what the agents/Steve were expecting with what was actually approved. Once I can tell them what was actually approved, I can then move forward and show them what their options are . . . now that they aren't looking at an annually renewable deal for up to 5 years." (Dkt. No. 36-4).

An email dated August 18, 2009, from Liz Burgess to Mr. Hammatt and Mr. Castro, among others, states, in part, "We need to be able to talk to the client. He is getting bad information. We need to be able to explain that he has purchased life insurance. It is not free. He is borrowing money for the premiums. He is personally obligated on the loan. He has a one-year renewable term loan. . . . The original term was secured by the policy and a personal [guaranty]. The bank is willing to renew the loan as well as finance additional premiums." (Dkt. No. 56-14).

An email dated September 22, 2009 from Liz Burgess to Mr. Castro references the Galeas' belief that they would not be personally liable on the loan transaction and states that "while this may be conceptually true at the inception of some premium financing, events beyond anyone's control interceded." (Dkt. No. 36-4). Mr. Castro responded that "we are told that the policy was the only collateral for the loan" and that he "was not aware of a personal guarantee

4

ever being signed." Liz Burgess responded that there was "so much confusion on the transaction." (Dkt. No. 36-4). There are other emails in the record that trace the parties' exchanges on these issues; these exchanges occurred well after the loan documents were executed.

During this same time period and then after, Mr. Imbimbo in his capacity as Trustee of the Trust executed with One Bank a "Modification and Extension of Promissory Note and Security Agreement." Mr. Imbimbo as Trustee executed this document on July 16, 2009, July 15, 2010, and December 5, 2010, each time for separate, successive extensions of the maturity date of the Promissory Note and Security Agreement for the loan (Dkt. No. 48, Exhibits G, H, and I). Each of these agreements includes in paragraph five the following language:

> The Borrower acknowledges, represents and warrants that (a) Bank has, and at all times during the debtor/creditor relationship between the parties, acted with commercial good faith toward the Borrower and has not, in any way, exercised improper control or dominion over Borrower; (b) Bank shall, in no way, be under any duty or obligation to further extend or renew the Note, or any other indebtedness, or any part thereof, beyond the maturity date established by this Modification Agreement; and (c) without any admission of liability whatsoever by the Bank, the Borrower hereby fully and completely releases the Bank from any and all claims of Bank misconduct which have been, or could have been, asserted by Borrower against the Bank regarding the statements, actions, or other conduct of the Bank regarding the Loan, the Note, this Modification Agreement, or any other document executed in connection therewith, or any other aspect of any relationship between the Bank, its employees, agents and independent contractors, and the Borrower prior to or contemporaneously with the execution of this Modification Agreement.

(Dkt. No. 48, Exhibits G, H, and I, ¶ 5).

To summarize, defendants claim that the Burgess Parties with apparent authority on behalf of One Bank made several false representations to Mr. Castro and others including Mr. Hammatt, intending for Mr. Castro to relay the representations to Mr. Imbimbo. These representations included that the loans were non-recourse, that the Galeas' personal assets would

not be exposed, that the life insurance policies issued by Lincoln Financial on the life of Mr. Galea were the only collateral needed for the loans, and that the Galeas would not be required to guarantee personally the loans. Alternatively, defendants claim that the correspondence between the Burgess Parties and One Bank demonstrates that the parties were mutually mistaken regarding the terms of the loan. Finally, Fae Galea claims that she did not sign a personal guaranty. Defendants do not otherwise contest the debt.

One Bank contends there is no evidence of an agency relationship between it and the Burgess Parties such that the alleged misrepresentations of the Burgess Parties, or alternatively their allegedly mistaken beliefs regarding the terms of the loan, could be attributed to One Bank. Further, One Bank directs the Court to the executed loan documents and the executed modification and extension agreements, the terms of which directly contradict the alleged misrepresentations or allegedly mistaken beliefs upon which defendants now attempt to rely to avoid the obligation.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party to establish by "specific facts" that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An issue of fact is material only if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

III.    **Analysis**

A.    **Agency**

The relation of agency is created as the result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and the other consents so to act. *Evans v. White*, 284 Ark. 376, 378, 682 S.W.2d 733, 734 (1985). The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control. *Id.* Agency is ordinarily a question of fact for the jury, but it becomes a question of law where only one inference can be reasonably drawn from the undisputed facts. *Undem v. First Nat'l Bank*, 46 Ark. App. 158, 163, 879 S.W.2d 451, 453 (1994).

Defendants contend that the Burgess Parties acted on behalf of One Bank with apparent authority in making alleged misrepresentations, including that the loans were non-recourse, that the Galeas' personal assets would not be exposed, that the life insurance policies issued by Lincoln Financial on the life of Mr. Galea were the only collateral needed for the loans, and that the Galeas would not be required to guarantee personally the loans.[2] "Apparent authority of an agent is . . . such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess." *Foundation Telecommunications, Inc. v. Moe Studio, Inc.*, 341 Ark. 231, 239, 16 S.W.3d 531, 536 (2000). "The third party's belief must be predicated on the principal's conduct, not the agent's conduct, because no agent can create evidence of apparent authority on his own." *Boudwin v. Hastings*

---

[2] It is unclear whether defendants intend to advance arguments of actual or implied authority. On the undisputed facts here, including but not limited to those noted in this Order, the affidavit of Vernon Scott, and the language of the loan documents sent by One Bank to defendants for signature, the Court rejects theories of actual or implied authority. *See Boudwin v. Hastings Bay Marina, Inc.*, 614 F.3d 780, 784-85 (8th Cir. 2010) (examining actual authority).

*Bay Marina, Inc.*, 614 F.3d 780, 784-85 (8th Cir. 2010) (citing *Foundation Telecommunications*, 341 Ark. 331, 16 S.W.3d 531). "[I]t is the actions and words of the principal . . . that create the agency and must be traced to that source." *Schmoll v. Hartford Cas. Ins. Co.*, 104 Ark. App. 215, 221-22, 290 S.W.3d 41, 46 (2008). To establish apparent authority, defendants must show "'(1) that [One Bank] held the [Burgess Parties] out as possessing sufficient authority to embrace the particular act in question, or knowingly permitted [them] to act as having such authority; and (2) that [defendants] knew of the facts and acting in good faith had reason to believe and did believe that the agent possessed the necessary authority.'" *Wal-Mart Stores, Inc. v. Crist*, 855 F.2d 1326, 1331 (8th Cir. 1988) (quoting *Central Surety & Ins. Corp. v. O. & S. Wholesale Co.*, 193 Ark. 523, 101 S.W.2d 167 (1937)).

The undisputed facts show that the Burgess Parties did not act with apparent authority. Defendants never communicated directly with One Bank or the Burgess Parties during the loan transaction. Mr. Imbimbo did not communicate with anyone outside of Mr. Castro's office, and Mr. Galea communicated through Mr. Imbimbo. Mr. Castro never told Mr. Imbimbo that the Burgess Parties would arrange the financing. At the time of the loan, Mr. Galea did not believe Mr. Burgess had any relationship with One Bank. In fact, defendants did not know of the Burgess Parties' involvement until a year after the loan was made. These undisputed facts do not support a theory that defendants knew of the facts and acting in good faith had reason to believe and did believe the Burgess Parties allegedly possessed the necessary authority from One Bank to make the representations at issue here.

Defendants point to the email correspondence between Ms. Redding, Mr. Hammatt, and Mr. Guerriero as evidence of the Burgess Parties' apparent authority. They argue that Ms. Redding's use of the word "we" indicates that the Burgess Parties were speaking on behalf of

One Bank.  There is no evidence that defendants were privy to the email exchange.  Defendants also cite web pages from the Burgess Parties as evidence of the Burgess Parties' agency.  There is no evidence that defendants reviewed these web pages prior to executing the loan documents.  Even if defendants had been provided these emails or reviewed the web pages prior to executing the loan documents, the Burgess Parties' statements, by themselves, do not establish apparent authority.  *See Schmoll*, 104 Ark. App. 215, 290 S.W.3d 41 (affirming summary judgment on the issue of apparent authority where the only evidence of agency were the acts of the purported agent).  Moreover, non-recourse financing as to this transaction is never mentioned in the email exchange or on the web pages.

The Court observes that defendants have submitted sufficient supporting factual material to create a disputed issue of fact as to whether the Burgess Parties represented at some point to Mr. Hammatt and Mr. Castro that a loan from *a lender* would be non-recourse, but defendants do not submit sufficient supporting factual material to tie that representation back to One Bank.  There is nothing in this record that links such a representation to One Bank at any point in this transaction.

The Court also observes that defendants have submitted sufficient supporting factual material to create a disputed issue of fact as to whether Mr. Castro told Mr. Imbimbo at some point that Mr. Castro would get financing through *a bank* and that it would be non-recourse.  Again, defendants do not submit sufficient supporting factual material to tie that representation back to One Bank.

Defendants have submitted no evidence of a manifestation traceable to One Bank of which defendants or their agents were aware prior to executing the loan documents that the Burgess Parties were authorized to act on behalf of One Bank in the initial loan transaction or to

9

represent that the transaction would include a non-recourse loan made by One Bank, that the Galeas' personal assets would not be exposed, that the life insurance policies issued by Lincoln Financial on the life of Mr. Galea were the only collateral needed for the loans, or that the Galeas would not be required to guarantee personally the loans.  Therefore, One Bank is entitled to summary judgment on defendants' fraud claim.

Defendants' claim of mutual mistake fails for the same reason.  There is no evidence of a mistake on the part of One Bank as to the terms of the loan, which were accurately set forth in the loan documents, and absent evidence of a manifestation traceable to One Bank of which defendants or their agents were aware prior to executing the loan documents that the Burgess Parties were authorized to act on behalf of One Bank in the initial loan transaction or to represent that the transaction would include a non-recourse loan made by One Bank, that the Galeas' personal assets would not be exposed, that the life insurance policies issued by Lincoln Financial on the life of Mr. Galea were the only collateral needed for the loans, or that the Galeas would not be required to guarantee personally the loans, no mistake on the part of the Burgess Parties can be attributed to One Bank.  Therefore, One Bank is entitled to summary judgment on defendants' claims of mutual mistake.

### B.   Release

One Bank also contends that the Trust released all claims against One Bank when the loan was modified and that this release entitles One Bank to summary judgment.   The modification and extension agreements, signed by Mr. Imbimbo as trustee of the Trust, provide that the Trust as the borrower "releases the Bank from any and all claims of Bank misconduct which have been, or could have been, asserted by Borrower against the Bank regarding the statements, actions, or other conduct of the Bank regarding the Loan, the Note, this Modification

Agreement, or any other document executed in connection therewith, or any other aspect of the relationship between the Bank, its employees, agents and independent contractors, and the Borrower prior to or contemporaneously with the execution of this Modification Agreement." Defendants argue that the release language does not preclude them from asserting fraud as a defensive setoff, citing the Court's ruling in its September 25, 2012, order that their fraud claim could be asserted as a setoff to the extent it does not exceed the amount of One Bank's claim.

The modification and extension agreements were not before the Court when it ruled on One Bank's motion to dismiss.  The Court ruled that, because the defendants' fraud claim was barred by the statute of limitations, it could only be asserted as a defensive setoff.  The authority cited by the Court for its ruling does not support the argument defendants make here, and defendants have not provided any controlling or persuasive authority that does.

The modification and extension agreements release all claims of misconduct on the part of One Bank.  The Court is not persuaded by defendants' attempt to argue to the contrary.  The Court concludes that, whether asserted as a defense or an affirmative claim, the Trust has released any claim for fraud or mistake it may have against One Bank.

### C.     Guaranty Agreements

There are two guaranties at issue.  Mr. Galea does not dispute the genuineness of his signature on the guaranty executed in connection with the loan documents, but he disclaims knowing the document was a guaranty and disputes its enforceability based on fraud and mutual mistake.  The Court's ruling on apparent authority resolves the defenses raised by Mr. Galea to the guaranty he executed.

That ruling does not resolve all issues regarding Ms. Galea's guaranty.  Along with disclaiming knowing the document was a guaranty and disputing its enforceability, which are

issues resolved by the Court's ruling on apparent authority, Ms. Galea also disputes the genuineness of her signature.  That issue requires separate analysis.

Ms. Galea claims she did not sign a personal guaranty and, therefore, is not liable on the loan.  She argues that her response to One Bank's request for admission denying the authenticity of her signature on the guaranty creates a genuine issue of material fact.  She also submits a "Report of Findings" by Dawn D. Reed FDE in support of her claim that her signature is not genuine.  In her report, Ms. Reed states that "[s]ignificant differences in detail" between the signature on the guaranty and Ms. Galea's handwriting, "indicat[e] another writer was involved."

One Bank objects and asserts that the response to the request for admission denying the authenticity of Ms. Galea's signature is not competent supporting factual material under Rule 56 of the Federal Rules of Civil Procedure to create a genuine issue of material fact on this point. This Court agrees as to the denial of the request for admission.  One Bank does not object, however, to Ms. Reed's report, and the report and testimony consistent with it may be admissible at trial.  Ms. Reed's findings demonstrate that there is a genuine issue of material fact as to the genuineness of Ms. Galea's signature on the guaranty and her alleged personal liability on the loan.

IV.     **Conclusion**

For the foregoing reasons, One Bank's motion for summary judgment is granted as to defendants' claims of fraud and mutual mistake, and One Bank shall have judgment against The Carmelo Galea Family Insurance Trust on the note and against Carmelo Galea a/k/a Charles Galea on his guaranty.  One Bank's motion for summary judgment as to Fae Galea is denied.

SO ORDERED this  3  day of December, 2012.


_Kristine G. Baker_
Kristine G. Baker
United States District Judge